**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FRIENDS OF THE DELAWARE RIVER LLC,<br>Plaintiff,<br>v.<br>MARTELLI'S METAL FABRICATION, INC.,<br>Defendant. | No. 2:25-cv-5806-CMR<br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Congress's enactment of 33 U.S.C. § 1365—the statute under which Plaintiff Friends of the Delaware River LLC ("Plaintiff") pursues this case—upsets the balance struck by the U.S. Constitution's Framers. In 1787, they vested the executive power in a President and established Executive Branch unity by giving the President the power to appoint, oversee, and remove subordinates. The Framers feared that a plural executive would lead to second-guessing of the President's decisions. Although the Framers chose this arrangement, Congress in 1972 shattered Executive Branch unity with Clean Water Act ("CWA") citizen suits, which allow additional actors to exercise executive power. And that is what happened here: despite being notified of the alleged violations in April 2025, the President's subordinates did not bring an enforcement action. That should have been the end of the story. But because Congress undermined the President's prerogatives, Plaintiff—who thinks it knows better than the President, Department of Justice, and U.S. Environmental Protection Agency ("EPA")—was allowed to second-guess the Government and bring the very claims the Executive declined to pursue.

This vitiating of the President's enforcement decisions threatens the liberty and accountability our Framers sought to ensure. The vesting of all executive power in an accountable government official was just as much a part of Article II's design as the vesting of that power in

one individual. Under this structure, private, unaccountable plaintiffs may not seek public remedies, which is exactly what Plaintiff attempts here by suing for civil penalties payable to the U.S. Treasury to the tune of over $64,000 per day, per violation. Because Plaintiff wields executive power, this triggers the private nondelegation doctrine, which prevents private individuals from wielding government power and limits their role to giving advice, assistance, and recommendations to an agency with authority and surveillance over them. Plaintiff cannot meet this test. And because Congress has allowed Plaintiff to wield executive power to bring a lawsuit that the Executive declined to pursue, Congress has interfered with the President's ability to employ prosecutorial discretion and thereby violated the Executive Vesting and Take Care Clauses. For these reasons, the Court should enter judgment in Defendant's favor.

## STATEMENT OF FACTS & PROCEDURAL HISTORY

Defendant Martelli's Metal Fabrication, Inc. ("Defendant") "owns and operates" a "metal fabrication facility" (the "Facility") located in Ivyland, PA. *See* Complaint ("Compl.") (ECF Doc. 1) ¶¶ 1, 16-17. On April 3, 2025, Plaintiff sent a Notice of Intent to Sue Letter to Defendant and the EPA Administrator, threatening to sue and alleging that Defendant was violating the CWA. *Id.* ¶¶ 5-6. EPA did not sue Defendant prior to October 10, 2025. *Id.* ¶ 7. On that date, Plaintiff filed its five-count CWA Complaint under 33 U.S.C. § 1365(a), bringing claims for (1) failure to obtain NPDES Permit coverage for stormwater discharges; (2) discharges in violation of General Permit prohibitions; (3) discharge violation of General Permit effluent limitations; (4) failure to develop/implement an adequate preparedness, prevention, and contingency plan; and (5) failure to develop/implement adequate stormwater monitoring and recordkeeping. *Id.* ¶¶ 81-131.

Plaintiff alleges that since "at least April 1, 2020, Defendant has been discharging and continues to discharge polluted stormwater from the Facility without a permit in violation of the"

CWA. *Id.* ¶ 2. This stormwater allegedly "is discharged from the Facility into the municipal storm drain, Little Neshaminy Creek, then into the Neshaminy Creek, before eventually reaching the Delaware River," which are among the "waters of the United States." *Id.* ¶ 76. Plaintiff believes Defendant is required to obtain coverage under the "General Permit for Discharges of Stormwater Associated with Industrial Activity (the 'General Permit')." *Id.* ¶¶ 2, 18. Plaintiff seeks declaratory and injunctive relief, requests that the Court order Defendant to pay civil penalties of up to $64,618.00 per day per violation, and seeks its costs and attorney's fees. *Id.* at Relief Requested.

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings," Fed. R. Civ. P. 12(c), which may be granted when the movant shows "'that no material issue of fact remains'" and the movant is "'entitled to judgment as a matter of law.'" *Allmerica Fin. Benefit Ins. Co. v. Hunt*, 812 F. Supp. 3d 509, 515 (E.D. Pa. 2025) (citation omitted). An argument challenging the constitutionality of a statute may be made through a Rule 12 motion. *See United States v. Morrison*, 529 U.S. 598, 604 (2000).

## LEGAL ARGUMENT– 33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS

### I. Plaintiff Is Exercising the Executive Power

Through § 1365, Congress has unconstitutionally vested executive power in private citizens by allowing them to seek civil penalties payable to the U.S. Treasury for alleged CWA violations. The Framers vested "the 'executive Power'—all of it—. . . 'in a President,'" and the pursuit of "daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 219 (2020) (citation omitted); *see also Trump v. Slaughter*, 146 S. Ct. 2283, 2305 & n.4 (2026); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). As Plaintiff seeks civil penalties payable to the U.S. Treasury of over $64,000 per

violation, it exercises executive power. *See* Compl. Relief Requested ¶ E; *see also* Baron de Montesquieu, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6, p. 157 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ("the executive power" includes the power by which one "punishes"); John Locke, *Second Treatise on Government* §§ 7, 13, pp. 9, 12 (East India Publishing Co. ed. 2023) (1689) ("the executive power" includes the "right to punish the transgressors").[1]

Further, Plaintiff exercises executive power by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam); *see also Slaughter*, 146 S. Ct. at 2305 ("[T]he 'discretionary power to seek judicial relief' lies at the very core of executive authority." (quoting *id.* at 138)). There is a distinction between injured parties seeking reparation for private wrongs and suits that seek to redress "a wrong to the public," not just "a wrong to the individual." *Huntington v. Attrill*, 146 U.S. 657, 668 (1892). This distinction is rooted in "the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs,'" *id.* (quoting 3 William Blackstone, *Commentaries on the Laws of England* *2), and rights are divided into private rights and public rights. *Ellingburg v. United States*, 607 U.S. 163, 179-80 (2026) (Thomas, J., concurring) (discussing Blackstone).

"[P]ublic rights" involve duties owed "to the whole community, considered as a community, in its social aggregate capacity." 4 Blackstone, *supra*, at *5; *see Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune v. Wofsy*, 838 F.3d 992, 1001 (9th Cir. 2016) (citation omitted), and "include interests generally shared, such as . . . general compliance with regulatory

[1] Because *Seila Law* already settled this issue, based on this precedent alone, this Court can hold that Plaintiff's pursuit of civil penalties is an exercise of the executive power. Besides the argument from precedent, this Court can conduct an originalist analysis, and such an analysis of "the executive power" points to the same conclusion. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring).

law." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004) (citation omitted). A public wrong could be pursued only "at the suit of the king" for public remedies such as "fine and imprisonment." 4 Blackstone, *supra*, at *6. In contrast, private rights are those "'belonging to individuals, considered as individuals.'" *Huntington*, 146 U.S. at 668 (quoting 3 Blackstone, *supra*, at *2); *Wofsy*, 838 F.3d at 1001 (same). Such rights an individual can redress only by pursuing private remedies, which would "either restor[e] to him his right, if possible; or by giving him an equivalent" of "private compensation" through "civil satisfaction in damages." 4 Blackstone, *supra*, at *6-7; *see* Locke, *supra*, § 10, p. 10.

Citizen suit plaintiffs sue to vindicate public rights by "directly initiat[ing] enforcement actions," *see* Compl. ¶ 9, as "citizen plaintiffs effectively stand in the shoes of the EPA." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987); *see Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (Citizen plaintiffs "seek relief not on their own behalf but on behalf of society as a whole[.]" (citation omitted)). Plaintiff is suing to redress alleged wrongs to public rights because it alleges harms to the "waters of the United States." Compl. ¶ 76. Indeed, it admits that the only time the CWA applies is when the "waters of the United States" are implicated. *Id.* ¶ 23. There are alleged harms to three "waters," *id.* ¶ 9, none of which Plaintiff alleges an ownership interest in, as the only alleged "recreational, educational, scientific, conservation, aesthetic, [and] spiritual" interests are those shared by all "citizens, taxpayers, property owners, and residents" who "live[], work[], travel[] near, and recreate[] in close proximity to the" waters. *Id.* ¶ 10. Thus, Plaintiff seeks to "[v]indicat[e] 'the *public* interest'" which "is the function of Congress and the Chief Executive.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation omitted); *see* 4 Blackstone, *supra*, at *2; Saikrishna Prakash, *The Essential Meaning of*

*Executive Power*, 2003 U. Ill. L. Rev. 701, 789. Vindicating the public interest is not the function of private individuals, but Plaintiff attempts to do so here.

## II. Plaintiff's Exercise of Executive Power Violates the Private Nondelegation Doctrine

Congress's vesting of executive power in private plaintiffs, and Plaintiff's attempt to wield it here, run afoul of the private nondelegation doctrine. This doctrine teaches that the Constitution's separation of powers forbids Congress to enact a law that "allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025).[2] In contrast, laws are permissible under which "private actors" provide only "advice and assistance" to "[g]overnment agencies" and "give [them] recommendations." *Id.* at 692. A government agency must "retain[] decision-making power" so that "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Id.* at 692, 695 (citation omitted). Further, private actors must "'function[] subordinately to' the agency" and be "subject to [the agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). Section 1365 violates this doctrine by allowing citizen plaintiffs to govern. None of Plaintiff's actions "are subject to full review by a public official who is responsible and responsive to the political process." *Cospito v. Heckler*, 742 F.2d 72, 89 (3d Cir. 1984) (citing *Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1977)).

Section 1365 lets citizen plaintiffs govern by allowing them to exercise executive power. *See supra* pp. 3-6. Here, Plaintiff exercised that power by filing its Complaint without the Government's "say-so." *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). This violates the private nondelegation doctrine. Plaintiff did not advise the Government that the Government should file this Complaint. Plaintiff did not give the Government assistance in filing this

[2] *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring); *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("*Black I*").

Complaint. And it did not recommend that the Government file this Complaint. *Id.* at 692. Instead, Plaintiff governed by making this filing without the Government's "say-so." *Id.* at 695. Thus, one cannot say the Government "alone has decision-making authority." *Id.* at 693.

Further, Plaintiff does not "'function[] subordinately to' [any] agency" because it is not "subject to [any agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). To determine what authority the Executive Branch has over Plaintiff, the proper place to look is the pertinent statute, as an "agency 'literally has no power to act unless and until authorized by statute.'" *FCC v. AT&T, Inc.*, 608 U.S. 531, 541 (2026) (citation omitted) (cleaned up). The CWA gives the Executive Branch essentially no authority over Plaintiff. The only post-suit rights any officials have is that "the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator," and, if the private plaintiff wants to settle with the defendant, the Attorney General and Administrator are entitled to only a 45-day review period. 33 U.S.C. § 1365(c)(3). They lack final decision-making authority over the proposed consent judgment. This scheme inverts the way the public and private entities are supposed to interact. To survive private nondelegation doctrine scrutiny, "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). If the private plaintiff wants to settle, however, the Government makes recommendations and the private plaintiff retains the say-so.

Although the Administrator "may intervene as a matter of right," 33 U.S.C. § 1365(c)(2), this limited intervention right does not "allow the Administrator to unilaterally dismiss a citizen suit once he has intervened." *See NAACP v. X.AI Corp.*, --- F. Supp. 3d ----, 2026 WL 3124447, at *6 (N.D. Miss. Oct. 19, 2026). It can be contrasted with the right Congress gave in the False Claims Act ("FCA") *qui tam* statute, another law that allows private plaintiffs (known as relators) to exercise executive power. 31 U.S.C. § 3730(b)(2), (c)(2)(A), (c)(3). That statute expressly gives

the Government the ability to intervene and dismiss a *qui tam* action at any time over a relator's objection. *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).[3] The Executive Branch "is given no statutory authority to approve, review, or countermand any of [Plaintiff's litigation] decisions. All of that enforcement, according to [CWA]'s 'plain terms,' 'can be done by the private entities without the [Executive Branch]'s involvement.'" *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 178 F.4th 224, 247 (5th Cir. 2026) (citations omitted).

The CWA's "diligent prosecution bar" does not remedy the statute's constitutional defects. That bar prevents a citizen plaintiff from suing if EPA "has commenced and is diligently prosecuting a" CWA action. 33 U.S.C. § 1365(b)(1)(B). But critically, the EPA Administrator has only "sixty days" to exercise this authority "after the plaintiff has given [the Administrator] notice." *Id.* § 1365(b)(1)(A). If EPA does not sue within sixty days, then the citizen plaintiff may file its complaint without the Government's say-so. And even when EPA sues within sixty days, "any citizen may intervene as a matter of right." *Id.* § 1365(b)(1)(B). Thus, the diligent prosecution bar does not actually "bar" citizens from wielding executive power. It is wholly illusory.

Therefore, the argument against the constitutionality of the CWA's citizen suit provision is even stronger here than the argument successfully advanced against the private Financial Industry Regulatory Authority ("FINRA"). The D.C. Circuit preliminarily enjoined FINRA from expelling a member prior to review by the Securities and Exchange Commission ("SEC") because "SEC review can come only after, not before, the expulsion [from FINRA] takes effect," which would be "too little too late." *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1326 (D.C. Cir. 2024), *cert.*

---

[3] In this way, the constitutionality of § 1365 is even more suspect than the FCA *qui tam* statute. *Polansky*, 599 U.S. at 442 (Kavanaugh, J., joined by Barrett, J., concurring) (stating "'[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'" (citation omitted)); *id.* at 449 (Thomas, J., dissenting) (same).

*denied*, 145 S. Ct. 2751 (2025). But with the CWA, there is no supervisory role for any federal actor once the citizen suit has been filed. *X.AI*, 2026 WL 3124447, at *5 ("EPA[] . . . does not . . . retain[] complete control over *all* Clean Air Act litigation."). Thus, Plaintiff does not "*remain*[] 'subject to [the agency's] pervasive surveillance and authority' when it matters." *Oklahoma*, 163 F.4th at 314 (alteration in original) (emphasis added) (citation omitted).

Even opinions finding no private nondelegation doctrine violation serve to underscore how far citizen suits are from satisfying this doctrine. The *Consumers' Research* Court upheld a delegation from the Federal Communications Commission ("FCC") to the private Universal Service Administrative Company, which serves as Administrator for the Universal Service Fund. Whereas "the Administrator is broadly subordinate to the" FCC because the "FCC appoints the Administrator's Board of Directors and approves its budget," here, Plaintiff self-appoints and approves its own case budget. *Consumers' Rsch.*, 606 U.S. at 692-93 (citation omitted). Further, the "Administrator makes the initial projections" and "estimates the programs' cost," which the FCC reviews "and either revises or approves." *Id.* at 693-94. Thus, the FCC was the entity making the final decision. In contrast, citizen plaintiffs do not recommend how CWA suits should proceed and instead litigate cases independent of EPA's surveillance. "In every way that matters to the constitutional inquiry, [Plaintiff], not the [EPA], is in control." *Id.* at 695.

And although the Third Circuit upheld the Beef Promotion and Research Act of 1985 (the "Beef Act"), it did so because the Beef Act gave the Cattlemen's Beef Promotion and Research Board only "ministerial" and "advisory function[s]." *United States v. Frame*, 885 F.2d 1119, 1129 (3d Cir. 1989). And unlike with CWA citizen suits, Board members were appointed and could be removed by the Secretary of Agriculture. *Id.* Further, all Board budgets, plans, and projects became effective only when approved by the Secretary, and the Board could not enter contracts without

the Secretary's approval. *Id.* Thus, unlike with CWA citizen suits, all "actions of the Cattlemen's Board [were] subject to the Secretary's pervasive surveillance and authority." *Id.* at 1128-29.

Further, this diffusion of executive power, and vesting of it in citizen plaintiffs who are not accountable to the President, impairs the liberty and accountability the separation of powers was meant to secure. *Oklahoma*, 163 F.4th at 305 ("Transferring unchecked federal power to a private entity that is not elected, nominated, removable, or impeachable undercuts representative government at every turn."); *see also Ass'n of Am. R.R.s*, 575 U.S. at 57 (Alito, J., concurring); *Black I*, 53 F.4th at 880; Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339, 391 (1990). Plaintiff does not merely give advice, assistance, and recommendations to EPA, it does not function subordinately to EPA, and it is not subject to EPA's authority and surveillance such that EPA retains decision-making power. *Consumers' Rsch.*, 606 U.S. at 692; *see also Alpine*, 121 F.4th at 1325; *Black I*, 53 F.4th at 889-90. For these reasons, and because "'quintessentially executive' power may not be cleaved off from the Executive Branch," *Slaughter*, 146 S. Ct. at 2305 (citation omitted), § 1365 violates the private nondelegation doctrine.

## III. CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion

Congress's vesting of executive power in private plaintiffs impairs the President's ability to "[s]et[] prosecutorial priorities," which "lies within the President's Article II power." *Trump v. California*, --- S. Ct. ----, 2026 WL 2473573, at *3 (Aug. 24, 2026); *see also United States v. Texas*, 599 U.S. 670, 684 (2023); *id.* at 689 (Gorsuch, J., concurring in judgment). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The Framers imbedded this concept in Article II because they took to heart "Montesquieu's maxim"

that "[i]f the executive and legislative powers were united, the wielder of both powers would enact tyrannical laws and execute them tyrannically." Prakash, *supra*, at 798 (footnotes omitted). With "the executive Power" separated, however, "the executive could temper the effects of tyrannical laws with mild execution." *Id.* at 781 (footnote omitted); *see also* Locke, *supra*, § 11, p. 10-11.

The power of prosecutorial discretion extends to "an agency's decision not to prosecute or enforce, whether through civil or criminal process, [and] is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). This is because "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832 (citation omitted); *see also Buckley*, 424 U.S. at 139. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants . . . falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Through CWA citizen suits, however, private plaintiffs (and their attorneys) vitiate prosecutorial discretion by choosing how to prioritize and how aggressively to pursue CWA actions against defendants. Indeed, the only time citizen suit plaintiffs can sue is when, after a 60-day waiting period, the Executive Branch does not prosecute the alleged CWA violation. *See* 33 U.S.C. § 1365(b)(1)(A). To be sure, the President may head off the citizen suit by having the Administrator commence a lawsuit, *see id.* § 1365(b)(1)(B), but this impinges on the President's power of prosecutorial discretion by forcing him to do the very thing he does not want done.

*Trump v. United States* confirms that Congress may not second-guess the Executive Branch's enforcement decisions, as the Court there reiterated that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against

defendants who violate the law,'" and this authority finds its source in the Take Care Clause. 603 U.S. 593, 620 (2024) (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting); *see also Slaughter*, 146 S. Ct. at 2307. The CWA's citizen suit provision, however, allows Congress to avoid this prohibition by empowering private citizens to bring the very claims that the President decided not to pursue. Thus, "'by concentrating power in a unilateral actor insulated from Presidential control,'" Congress breaks the executive chain of command by allowing unaccountable private parties to bring lawsuits that the Executive Branch has chosen not to pursue. *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (citation omitted).

Moreover, by requiring this Court "to enforce" the very "effluent standard or limitation" that the President has declined to enforce, *see* 33 U.S.C. § 1365(a), Congress exacerbates the problem by "transfer[ring] from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). The Supreme Court has "always rejected" such a "vision of [its] role" that "would enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *Id.* (citations omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("But federal courts do not exercise general oversight of the Executive Branch . . . ."). It has also recognized a distinction between "a mere ministerial duty, the performance of which might be judicially enforced," and a duty that is "purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866). There are "general principles which

forbid judicial interference with the exercise of Executive discretion," as any attempt by the Judiciary to control discretionary duties "might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* at 499. This is what Congress forces the Judiciary to do with § 1365.

This subjects citizen suit defendants to a loss of "liberty as described by Locke"; liberty understood as "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another man.'" *Ass'n of Am. R.R.s*, 575 U.S. at 75-76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J. Gough ed. 1947)); *see also Seila Law*, 591 U.S. at 223-24. Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J., concurring). But because CWA citizen suits prevent the proper operation of Article II, any private plaintiff who disagrees with EPA's decision not to sue can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gave the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President and his Executive Branch subordinates' power to decline to bring lawsuits. *Texas*, 599 U.S. at 678; *Heckler*, 470 U.S. at 831-32. Congress undermined that prerogative with CWA citizen suits.

## IV. CWA Citizen Suits Have No Basis in History or Tradition

Besides examining Article II's clauses to determine whether Congress violated the separation of powers, the Supreme Court considers as relevant whether a statute lacks a historical precedent. According to this criterion, courts considering constitutional challenges should view Congressional enactments with skepticism when they are "an innovation with no foothold in history or tradition." *Seila Law*, 591 U.S. at 222. "'Perhaps the most telling indication of the severe constitutional problem with [a statute] is the lack of historical precedent for'" it. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (citation omitted). Citizen suits have no foothold in history

or tradition because, "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs . . . . The situation has changed markedly, especially over the last 50 years or so." *TransUnion*, 594 U.S. at 428 n.1. Their status as "a historical anomaly" provides additional evidence as to why there are constitutional violations. *Seila Law*, 591 U.S. at 220, 222; *see United States v. Arthrex*, 594 U.S. 1, 21 (2021).[4]

Far from there being a tradition of private citizens exercising executive power, there has been since the Founding a tradition of the Executive pursuing public remedies to vindicate public rights and having discretion over such suits. *See supra* pp. 3-6, 10-13. This tradition was confirmed by the Court in the nineteenth century. *Martin v. Hunter's Lessee*, 14 U.S. 304, 329-30 (1816) ("The second article declares that 'the executive power *shall be vested* in a president of the United States of America.' Could congress vest it in any other person . . . ? It is apparent that such a construction . . . would be utterly inadmissible."); *Confiscation Cases*, 74 U.S. 454, 457 (1868). This understanding continued into the twentieth century, *Buckley*, 424 U.S. at 139; *Printz v. United States*, 521 U.S. 898, 922-24 (1997), and remains the law today. *All. for Hippocratic Med.*, 602 U.S. at 382; *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment).

Any contention that citizen suits are constitutional because they have been included in federal statutes over the last fifty-six years, must be rejected. A court's "inquiry is sharpened rather than blunted by the fact that Congressional [enactments] are appearing with increasing frequency in statutes which delegate authority to" private plaintiffs to wield executive power. *INS v. Chadha*, 462 U.S. 919, 944 (1983); *see also Slaughter*, 146 S. Ct. at 2309; *Seila Law*, 591 U.S. at 231-32. Indeed, due to the nature of Congress's constitutional powers, it is unsurprising that it can take

[4] The United States agrees "citizen suits lack the historic pedigree" needed for them to be upheld. *See NAACP v. x.AI*, No. 3:26-cv-74, ECF Doc. 86 at ECF p. 28 n.5 (N.D. Miss. July 7, 2026).

more than a half-century for novel Congressional enactments to be found unconstitutional. Because Congress's powers are "'at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'" *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273-74 (1991) (citation omitted). Congress has encroached on the Executive Branch by creating CWA citizen suits, which have no "foothold in history or tradition," a consideration that points to a separation of powers violation.[5]

## CONCLUSION

Although the Constitution envisions checks against the excessive application of executive power, CWA citizen suits eviscerate these checks by violating the Constitution. Any role private plaintiffs may have in the enforcement of federal environmental law is constitutionally limited to seeking private remedies for alleged private wrongs. If Congress believes under-enforcement of the CWA to be a problem, "other forums remain open for examining the Executive Branch's" purported lack of diligence. *Texas*, 599 U.S. at 685 (listing Congressional "oversight, appropriations, the legislative process, and Senate confirmations" and "elections"); *cf. NRSC v. FEC*, 146 S. Ct. 2404, 2422 (2026) ("lack of Government . . . enforcement . . . is not an excuse for the Government . . . to turn around and enact legislation that" is unconstitutional). Because CWA citizen suits are unconstitutional, the Court should enter judgment in Defendant's favor.

---

[5] Defendant acknowledges that multiple district courts have rejected constitutional arguments against CWA citizen suits. *See, e.g.*, *Patterson v. Barden & Robeson Corp.*, No. 04-cv-803, 2007 WL 542016, at *8 (W.D.N.Y. Feb. 16, 2007); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555-56 (E.D.N.C. 2001); *Student Pub. Interest Rsch. Grp. of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478-79 (D.N.J. 1985); *see also Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*, 813 F. Supp. 1132, 1136-38 (E.D. Pa. 1993) (Emergency Planning and Community Right to Know Act). But none of these nonbinding opinions involved a private nondelegation doctrine argument, much less Defendant's history and text-based arguments. Moreover, they lacked the benefit of the Supreme Court's recent opinions.

DATED: October 29, 2026.

Respectfully submitted,

/s/ Sean J. Radomski
Sean J. Radomski (Pa. Bar No. 319732)
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
sradomski@pacificlegal.org

Damien M. Schiff* (Cal. Bar No. 235101)
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
dschiff@pacificlegal.org

**Pro hac vice*

Michael J. Troiani
van der Veen, Hartshorn & Levin
1219 Spruce Street
Philadelphia, PA 19107
Telephone: (215) 546-1000
mtroiani@mtvlaw.com

*Attorneys for Defendant Martelli's Metal Fabrication, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2026, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which is understood to have sent notification of such filing electronically to all counsel of record.

*/s/ Sean J. Radomski*
*Attorney for Defendant*